138 So.2d 342 (1962)
In re ESTATE of Madelon C. REID, Deceased.
No. 61-441.
District Court of Appeal of Florida. Third District.
March 8, 1962.
Rehearing Denied March 26, 1962.
*343 Redfearn, Ferrell & Simon, Miami, for appellant.
Creel & Glasgow and Stafford & Carter, Miami, for appellee.
Before HORTON, CARROLL and HENDRY, JJ.
HENDRY, Judge.
Madelon C. Reid, a resident of Dade County, Florida, died on March 21, 1961. A petition for probate of her will was filed in the County Judge's Court of Dade County by Richard C. Carter, Jr., as executor. The estimated value of the estate was $90,000. The appellant, John B. Reid, husband of the testatrix, filed an answer to the petition for probate in which he alleged that the purported will of his wife was invalid because she did not possess testamentary capacity at the time of the execution of the purported will on January 31, 1961. The answer further alleged that if she did have testamentary capacity when she signed the will her signing was the result of undue influence practiced on her by her attorney, Forney B. Stafford, while occupying a confidential relationship with her.
After hearing the testimony adduced by the parties on these issues the county judge entered his order which reads as follows:
"This matter came on to be heard upon the petition of Richard C. Carter, Jr. for the probate of the will of Madelon C. Reid, the answer of John B. Reid to said petition, and the evidence submitted by the parties. This will is dated January 31, 1961. The petitioner is the executor named in the will. The sole beneficiary under the will is Forney B. Stafford, the partner of the executor in the practice of law. John B. Reid is the surviving husband of the testatrix, but these parties had not lived together for several years prior to the execution of the will * * John B. Reid contests the validity of the will upon the following grounds:

*344 "(1) Lack of testamentary capacity of the testatrix.
"(2) Undue influence of the sole beneficiary in connection with the making of said will.
"After careful consideration of all of the evidence, the Court finds that the preponderance of the evidence shows:
"1. That at the time of the giving of the instructions for the preparation of the will and at the time of the execution of the will Madelon C. Reid possessed testamentary capacity.
"2. That the beneficiary, Forney B. Stafford, did not exercise undue influence upon Madelon C. Reid in connection with the making of said will.
"The Court further finds that the relation of attorney and client existed between the beneficiary and the testatrix in the preparation and execution of the will, since the will was prepared by the partner of the beneficiary and the execution of the will was supervised by an agent secured by said partner. This Court does not approve such conduct on the part of an attorney. However, the presumption of undue influence on the part of the attorney-beneficiary in this case is clearly rebutted by the evidence submitted.
"A denial of the probate of this will upon the evidence in this case would amount to a rewriting of Madelon C. Reid's will by the Court. Such a rewriting of a will is not a proper function of a probate court.
"It is, therefore, ORDERED AND ADJUDGED that the Last Will and Testament dated January 31, 1961, * * * attested by Mary Cooper, William Cooper and Mitchell J. Miodus as subscribing and attesting witnesses thereto, be and the same is hereby admitted to probate according to law as and for the true Last Will and Testament of said Madelon C. Reid * * * and that said will shall be duly recorded in the Book of Wills, and that the cost of recording the same be taxed as costs against this estate.
"Let Letters Testamentary issue to Richard C. Carter, Jr., the executor named in said will, upon his taking and subscribing the prescribed oath * * *".
The appellant has appealed from this order admitting the will to probate.
There are two questions raised by the appellant. The first one with which we shall deal arises from the adjudication by the county judge that the preponderance of the evidence showed that at the time of the execution of the will, Madelon C. Reid possessed testamentary capacity. The second question raised by the appellant is as to the finding of the county judge that the evidence showed that the sole beneficiary, Forney B. Stafford, did not exercise undue influence upon the testatrix in connection with the making of the will because the presumption of undue influence on the part of the attorney-beneficiary in this case was clearly rebutted by the evidence.
Our review of the record shows some conflicts in the evidence coming from the witnesses who testified before the trial judge as to whether Mrs. Reid had testamentary capacity to make a will at the time it was executed.
There were a number of witnesses who testified, some on behalf of appellant and some on behalf of the appellee.
Dr. Edward Roth, a witness called on behalf of the appellant was a practicing physician in the field of internal medicine who had known the testatrix for many years and who had treated her on occasions up until January 10, 1961. He testified that he believed she was insane and that he believed beyond a shadow of a doubt that she committed suicide which is the act of an insane person. He further testified that he *345 knew she was insane before her death and almost anticipated the occurrence; that she was addicted to drugs, which beclouds the mind and makes one further incompetent, so that she was incompetent to make a will. Dr. Roth further testified that when she came to his office and was under his observation she would look and stare in a most peculiar manner; that she would answer questions indirectly and acted furtively and peculiarly; that when he asked her a question, she would look at him with deep, piercing and frightened eyes, and be quiet for a while and then answer in some irrelevant manner; that he believed she had paranoid ideas, too; that she made terrible remarks about things that are going to happen; that it was his opinion that she was mildly insane and incompetent to make a will.
Mrs. Dorothy White, a witness called on behalf of the appellant, testified that she had known Mrs. Reid very well for more than six years and had associated with her quite often during the last few months of her life; that from her association with her and knowledge of her condition she was of the opinion that Mrs. Reid was not at any time during the last three months of her life capable of making an understanding distribution of her property by will.
Mrs. Jane Fisher, a witness called on behalf of the appellant, testified that she had known Mr. Reid for perhaps thirty years; that she had visited in her home socially and that they were friends; that they were generally in the same crowd socially and that she saw Mrs. Reid at different parties and always talked to her; that the last few times she saw her she notice a great change in her mentally and she found her incoherent; that the last six or seven times she saw Mrs. Reid there was something wrong with her since she did not talk intelligently; that she saw her on the evening of January 30, 1961, at a party at the Surf Club and that she was incoherent and acting as if she were intoxicated because she weaved around and held on to things; that she got up close to her and while talking, she unintentionally expectorated in her face; that from Mrs. Reid's mental and physical condition she would say that on January 31, 1961, the date of the signing of the will, she was not capable of making an understanding distribution of her property.
Mrs. Laverne Mathey, a witness called on behalf of the appellant, was a beautician who had attended Mrs. Reid for more than ten years. She testified that Mrs. Reid was showing a health problem; that she had grown quite thin and had become mixed up in her mind; that she would come in on Wednesday, Thursday or Saturday, thinking it was Friday; that Mrs. Reid was not mentally capable of making an understanding distribution of her property by will in January, 1961, as she was very ill and could not remember what she was saying.
Mrs. Bess Cavanan, who was called as a witness for the appellant, testified that she had known Mrs. Reid for about thirty years; that she was intimately friendly with Mrs. Reid and that they visited in each other's home and became very well acquainted and that such friendly acquaintance continued until her death; that she saw Mrs. Reid at the Surf Club on the evening of January 30, 1961; that Mrs. Reid was "high"; that she did not drink but "she was stepping high"; that she was not a stable person on that occasion and had not been for at least six months and that she was getting worse and worse during the last three or four months; that she was unstable both mentally and physically; that from her close association with Mrs. Reid and her observation of her during the month of January, 1961, and prior and subsequent thereto, it was her opinion that Mrs. Reid was not mentally capable of making a will during that time.
John B. Reid, the appellant, testified he was married to Madelon C. Reid in 1941, but at the time she died he had not lived with her for the past several years prior to her death; that Mrs. Reid talked to him over the telephone almost daily until her *346 death; that they discussed her wanting money for the beauty parlor and that he met her and frequently gave her money; that he and Mrs. Reid discussed the sale of her La Gorce membership and all the matters of business with her, including her income tax problem for 1960; that he and Mrs. Reid had an appointment with the accountant the day before she died, which he told Mrs. Reid he would change when he found her in no condition to go to the accountant's office; that he got Mrs. Reid to sign the Israel Bond Certificate so he could sell it for her; that Mrs. Reid had always taken a sedative at night since he had known her; that she had a fragile body and a good mind; but for the last three or four months did not know whether she was coming or going; that Mrs. Reid lost $12,000 on the Seventy-ninth Street property she acquired in a transaction he handled for her; that he gave Mrs. Reid money for groceries and the beauty parlor all along, possibly $1,000 or $1,500 from October to January; that she had given him Five or Six Thousand Dollars which he considered commission on the sale of the Del Ray property she owned, plus probably Five to Seven Thousand Dollars additional in the last two years prior to her death. He further testified that during the first five or six years of their marriage he was a prosperous business man and owned the Marine Terrace Hotel and engaged in the real estate and development business; and that he put a great deal of property in his wife's name beginning in 1943, the total value of which he estimated at several hundred thousand dollars.
Mrs. Ellen Orr Graves, a witness called on behalf of the appellee, testified that she had known Mrs. Reid socially continuously for about fifteen years prior to her death and described her as a very vivacious, very sweet person whom she had never heard make a catty remark or say an unkind word to anyone and who enjoyed a very fine moral reputation. She further described Mrs. Reid as one of the most intelligent women she had ever known; that she had a luncheon visit with Mrs. Reid for three or four hours some few months prior to her death, plus other casual meetings thereafter; that she heard Mrs. Reid say that she was terribly lonely and upset over her marriage; that she could not seem to get along with Mr. Reid and that he was a little bit sadistic; that it was her opinion and belief that Mrs. Reid had the mental capacity to make a knowing and understanding disposition of her property by will.
Mrs. Marian Hotchkiss, a witness called on behalf of the appellee, testified that she and Mrs. Reid were good friends and that she had known her for more than ten years and saw her socially constantly; that she kept in touch with Mrs. Reid pretty well up until shortly before her death and heard from her perhaps every week; that she saw Mrs. Reid at parties in January where Mrs. Reid was dining and dancing and on those occasions she had conversations with her; that Mrs. Reid called her early in February once or twice and that the last time she talked with her was two or three weeks before her death; that she and Mrs. Reid visited in each other's home; that Mrs. Reid was well dressed, gracious, gay, very vivacious, liked to dance, liked all the habiliments of pleasant living, loved parties and was always at her best at a party; that she was a good conversationalist and actually charming and much above average intelligence; that Mrs. Reid often discussed mutual friends and real estate problems with her; that Mrs. Reid was upset and worried over her diminishing income and the fact that she could not keep up her life socially as she had in the past; that in their last conversation Mrs. Reid related that she was upset because something she had relied upon Mr. Reid to do had not come through; that during her entire acquaintance with Mrs. Reid she never observed anything unusual or peculiar or abnormal about her conversation; and that Mrs. Reid was a very observant person. Mrs. Hotchkiss further testified that Mrs. Reid was taking some sort of sleeping pills during the last portion of her life as she *347 was suffering from some recurrent and painful urinary infection which she picked up during her travels, and she had difficulty getting to sleep; Mrs. Hotchkiss further stated that even during their final conversation two or three weeks before Mrs. Reid's death there was nothing unusual or abnormal about Mrs. Reid's conversation; that she felt it was just the same Madelon Reid she had always known; that she did not see any abnormality in this conversation; and that from her knowledge of Mrs. Reid, she was of the opinion that she could have made a knowing and understanding disposition of her property on January 31, 1961.
Dr. Joseph Davis, the County Coroner, testified that Mrs. Reid died from respiratory failure while under the influence of barbiturates and that her death was probably accidental; that there was no visible indication or damage to Mrs. Reid's brain from use of dope, alcohol or barbiturates, though this fact would not itself be determinative of mental capacity.
There was further testimony from the subscribing witnesses, the named executor and the intended beneficiary. Since the testimony of these witnesses is also pertinent to the second question, i.e. whether the deceased was unduly influenced, it will be set out later in this opinion. Suffice it to say, presently, that there is sharp conflict among the subscribing witnesses as to whether or not the deceased had testamentary capacity.
A review of all of the testimony and other evidence leads to the conclusion that there is a great deal of evidence to support a finding of testamentary incapacity. Nevertheless, the law of this state is clear as to the role of an appellate court when reviewing a county judge's finding that the testatrix had testamentary capacity. As we recently stated in Skelton v. Davis, Fla.App. 1961, 133 So.2d 432, "it is a well-settled rule of judicial administration that an order of a county judge sitting in probate not be disturbed on appeal where there is substantial competent evidence to sustain the finding unless the county judge has misapprehended the evidence as a whole." See In re Bailey's Estate, Fla. App. 1960, 122 So.2d 243; In re Wilmott's Estate, Fla. 1953, 66 So.2d 465, 40 A.L.R. 2d 1399.
Applying the foregoing test to the instant situation, we find that there was substantial competent evidence to support the finding of the county judge that the deceased, Madelon C. Reid, possessed testamentary capacity at the time the will was executed. This is so because it is not within our province to decide which of the witnesses gave the more exact or truthful testimony. Rather, the weight to be given to the testimony of each of the witnesses and the credibility to be attached thereto, is clearly within the sound discretion of the county judge. We cannot say that the county judge misapprehended the evidence as a whole where it appears that much of the evidence is in direct conflict. Accordingly we affirm his finding as to this question.
We shall now consider the remaining question: Was there sufficient evidence in the record to support the county judge's finding that the beneficiary, Forney B. Stafford, did not exercise undue influence upon Madelon C. Reid in connection with the making of the will, and that the presumption of undue influence on the part of the attorney-beneficiary in this case had been clearly rebutted.
The record shows and the lower court so held that the relationship of attorney and client existed between Forney B. Stafford, the sole beneficiary, and Madelon C. Reid, the testatrix, in the preparation and execution of the will; and that it was kept exclusively in the possession of his law partner, Richard C. Carter, Jr., until after the death of the testatrix. In this regard, Mr. Carter testified, among other things, that he is the law partner of Forney B. Stafford; that he prepared the will that has been offered for probate herein: *348 that the deceased, Madelon C. Reid, had expressed her desire to have a will drawn naming Forney B. Stafford as the sole beneficiary; that prior to the drawing of the will, his office received a copy of a will of the deceased executed in 1959 which purportedly left everything to her husband, John B. Reid; that he made out the new will in the same form as the old will but substituted the name of Forney B. Stafford for John B. Reid; that a subsequent telephone conversation confirmed that Madelon C. Reid wished to leave her estate to Forney B. Stafford; that she asked that he be the executor; that Madelon C. Reid insisted that the will be made out legally; that she described her husband as a vicious person; that he and Mrs. Reid arranged for Mr. Mitchell J. Miodus to bring the new will over for signature and the same was later accomplished; that the executed will and copy was placed in his drawer in a folder; that he believed that Forney B. Stafford had not seen the new will prior to Madelon C. Reid's death; and that after her death he instituted probate proceedings as the named executor.
Forney B. Stafford testified in part that he had handled several property transactions for Madelon C. Reid; that she had often stated that she had confidence in him and that she wanted to take him around and introduce him to her friends; that they had dinner together two or three times; that he never was paid anything to escort Mrs. Reid; that, all in all, he escorted Mrs. Reid to various functions about six to eight times; that he and Mrs. Reid were just friends and that they had never had any romantic attachment; that they had never quarreled; that she stated that she wanted him to draw her will and that she wanted to leave everything to him; that he advised her that he could not draw a will leaving everything to himself; that he asked Mr. Carter to handle it and that Mr. Carter said he would; that he knew nothing about the terms of the will and that he has never read the will; that he did ask Mrs. Reid to send in a copy of the old will so that Mr. Carter would have it as an aid to preparing the new will; and that he never induced her or asked her to change her will in his favor.
Let us next review the pertinent testimony of the three subscribing witnesses to the will, who were William B. Cooper and his wife, Mary, and Mitchell J. Miodus. Mr. and Mrs. Cooper were the managers of the co-operative apartment house where Mrs. Reid owned an apartment and lived at the time the will was executed. They had known Mrs. Reid for more than two years prior to the execution of the will and until she died. Mr. Miodus was a lawyer who had been employed by Mr. Stafford's law firm to go to Mrs. Reid's apartment and get the will executed.
Mr. Miodus, a practicing attorney, who was associated with Mr. Carter prior to the execution of the will, and now associated with the firm of Stafford and Carter, testified that Mr. Carter arranged for him to pick up the will and take it over to Mrs. Reid at her apartment on January 31, 1961; that he arrived at about 6:45 P.M. and introduced himself to Mrs. Reid when she met him at the door and said she was expecting him; that he asked Mrs. Reid to read the will; that she read it and remarked that it was exactly the way she wanted it; that Mrs. Reid then telephoned Mr. and Mrs. Cooper who lived in the same apartment house; that shortly thereafter they appeared and Mrs. Reid introduced them to him with the comment that he was an attorney who was there with the will; that after some further but brief conversation, he asked Mrs. Reid in the presence of the Coopers whether she had read this last will and testament, and if she understood it and whether it was the way she wanted it; to all of which she replied, "Yes". Mr. Miodus further testified that the will was duly signed by Mrs. Reid and witnessed by himself and Mr. and Mrs. Cooper, and at Mrs. Reid's request; that after the signing all the parties chatted a few minutes, then the Coopers left and he stayed and talked to Mrs. Reid for about one hour. He described Mrs. Reid as a rather intelligent woman, *349 well-traveled, pleasant and normal. He further testified that he was paid $20.00 for his services by Mr. Carter.
Mrs. Cooper, a witness called on behalf of the appellant, testified that she and her husband were called by telephone by Mrs. Reid to come up to the apartment to witness a paper; that she did not know what the paper was and that Mr. Miodus kept it folded so that they could not read it if they had wanted to; that the will was executed on the evening of January 31, 1961; that on the morning of that day she and her husband found Mrs. Reid lying naked and unconscious with her feet in the kitchen and her face on the concrete floor outside of the kitchen of her apartment, and only a few days before she and her husband had found her naked in the yard early in the morning; that at times they would find her crawling on the floor. She further testified that Forney B. Stafford was a paid escort; that she heard Mrs. Reid fussing with Mr. Stafford and that Mrs. Reid said that she was footing the party bills and that he was table-hopping, that is, dancing with everybody else except her; that Mrs. Reid told her that she was in love with Forney B. Stafford that from her observation of Mrs. Reid during the month before she executed the will and on the day she executed the will that she was then incapable of making an understanding disposition of her property by will.
Mr. Cooper was called as a witness on behalf of the appellant and his testimony was substantially the same as that of his wife.
Our Supreme Court has established the rule that if the beneficiary occupies a confidential relationship with the testator and is active in procuring the will and is made a substantial beneficiary therein, a presumption of undue influence arises. Zinnser v. Gregory, Fla. 1955, 77 So.2d 611; In re Palmer's Estate, Fla. 1950, 48 So.2d 732; In re Knight's Estate, Fla.App. 1959, 108 So.2d 629.
Mr. Stafford occupied a most important confidential relationship with Mrs. Reid, that of attorney and client. There is no relationship between individuals which involves a greater degree of trust and confidence than that of attorney and client. The relationship has its very foundation in the trust and confidence the client reposes in the attorney selected to represent him. An attorney is required to exercise in all his dealings with his client a much higher standard than is required in business dealings. The record clearly shows and the county judge so found that the confidential relationship existed and the presumption of undue influence existed in this case.
It is important in considering whether undue influence was exercised in the making of this will to consider the mental and physical condition of the testatrix at the time the will was executed. In re Krieger's Estate, Fla. 1956, 88 So.2d 497; In re Aldrich's Estate, 148 Fla. 121, 3 So.2d 856. It is not the means employed so much as the effect produced which must be considered in determining whether undue influence has contributed to the making of the will. Though the influence exerted on the testatrix was such that under ordinary circumstances or if exercised over ordinary persons of ordinary powers of resistance, it would be regarded as insufficient, if in the particular case it resulted in the disposition of property contrary to the testatrix' desire, the influence was undue. See Lewis v. Martin, 210 Ala. 401, 98 So. 635.
A much higher degree of proof is required to overcome an inference of undue influence where the testator is shown to have impaired mental powers or clouded intellect than where the testator is strong mentally and in good health. 57 Am.Jur., Wills § 356.
Applying the foregoing principles of law to the case at bar we find that we must reverse the county judge's finding that the beneficiary introduced sufficient evidence to rebut the presumption of undue influence *350 which existed because of the confidential relationship between the testatrix and the beneficiary.
True, there was evidence in behalf of the appellee that the testatrix was a gay and brilliant woman. However, there was an abundance of uncontradicted evidence that she was a heavy user of barbiturates; that she was found crawling on the floor of her apartment; that she wandered into the yard naked on occasions; that she would forget what day of the week it was; that she could not sleep; and that in the opinion of a treating physician she was mildly insane.
While she was not legally without capacity to make a will, the record irrefragably establishes that the testatrix was a person of extremely weak mental and physical health. Clearly then, it would take little to influence a person such as the testatrix.
In Gardiner v. Goertner, 110 Fla. 377, 149 So. 186, 189, it was stated that "`what degree of influence will vitiate a will depends much upon the bodily and mental vigor of the testator, for that which would overwhelm a mind weakened by sickness, dissipation, or age might prove no influence at all to one of strong mind in the vigor of life.'"
Relating the foregoing to the instant situation we find that the record shows that the attorney-beneficiary herein actively engaged in numerous social activities with the testatrix immediately before the execution of the will; that he was taking part in the business activities of the testatrix, as her attorney and close friend; that he spent many hours on the telephone with the testatrix; that Mr. and Mrs. Cooper, who were two of the subscribing witnesses to the proffered will testified that the testatrix told them that she was romantically attached to her attorney, Forney B. Stafford; that they further testified that they heard an argument between the testatrix and the beneficiary and that Forney B. Stafford, who was many years younger than the testatrix, was a paid escort during the times he was escorting her socially.
While it is true that the testimony of Mr. and Mrs. Cooper was, in effect, totally denied by Mr. Stafford, we find such denial insufficient to rebut the presumption created by the confidential relationship. The record is replete with circumstantial evidence tending to show that Forney B. Stafford was in position to influence the testatrix. It is to be remembered that in cases such as ours, there is rarely any direct evidence establishing undue influence, and accordingly, direct evidence is not necessary to establish undue influence. Oftentimes, undue influence is established by the results of what has transpired. Where the only legitimate inferences from the facts and circumstances of the case warrant the finding of undue influence, no direct evidence is necessary. Newman v. Smith, 77 Fla. 633, 82 So.2d 236, 251; in re Burton's Estate, Fla. 1950, 45 So.2d 873.
After careful scrutinization of the record, we find that the only evidence offered by the appellee to rebut the presumption consisted of the testimony of the appellee, the beneficiary and one of the subscribing witnesses. It is to be remembered that the appellee and the beneficiary were law partners and that the subscribing witness, Miodus, was in their employ. While this does not impair the veracity of the testimony, it does nevertheless bear heavily on the weight such testimony is normally given. It is further essential to note that the only testimony offered to rebut the allegation of undue influence which necessarily must have occurred prior to the alleged desire of the testatrix to change her will, was that of the beneficiary. This is necessarily so because the executor-appellee and the subscribing witness, Miodus, testified that they never met the testatrix before she announced her intention to change her will.
We find that the lone testimony of Forney B. Stafford was not enough to sustain the great burden the appellee had to carry to rebut *351 the presumption of undue influence. In the case of In re Palmer's Estate, Fla. 1950, 48 So.2d 732, which was very similar to the case at bar in that the mental condition of the testatrix was impaired and the chief beneficiary occupied a confidential relationship with the testatrix, the Supreme Court stated at p. 733:
"* * * the combination of such facts and circumstances would be universally held to give rise to a presumption that undue influence was exerted on the testatrix. * * * It then became the burden of the appellant [beneficiary] to prove the absence of undue influence on his part. * * *" [Emphasis added]
Viewing the evidence most favorably in the light of the appellee, we are still unable to find that the appellee sustained his burden by proving the lack of undue influence. Accordingly, we find the county judge erred in admitting the will in question to probate.
Reversed.